ORIGINAL

Approved: _Edward Diskant/Russell Capone/Robert Boone/Noah_
EDWARD B. DISKANT/RUSSELL CAPONE/ROBERT BOONE/NOAH
SOLOWIEJCZYK
Assistant United States Attorneys

Before:     THE HONORABLE JAMES L. COTT
            United States Magistrate Judge
            Southern District of New York

**17 MAG 7120**

SEP 25 2017
S.D. OF N.Y.

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :      SEALED COMPLAINT
                                 :
    - v. -                       :      Violations of
                                 :      18 U.S.C. §§ 1343,
JAMES GATTO                      :      1349, 1956(h), and 2
 a/k/a "Jim,"                    :
MERL CODE,                       :
CHRISTIAN DAWKINS,               :
JONATHAN BRAD AUGUSTINE, and     :      COUNTY OF OFFENSE:
MUNISH SOOD,                     :      NEW YORK
                                 :
              Defendants.        :
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      JOHN VOURDERIS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

### COUNT ONE
(Wire Fraud Conspiracy)

      1.    From at least in or about May 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE,
CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit wire fraud in violation of Title
18, United States Code, Section 1343.

      2.    It was a part and object of the conspiracy that JAMES
GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD
AUGUSTINE, and MUNISH SOOD, the defendants, and others known and

unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, GATTO, CODE, DAWKINS, AUGUSTINE, SOOD and others known and unknown, including basketball coaches employed by University-6 and University-7,[1] participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, University-6 and University-7 by making and concealing bribe payments to high school student-athletes and/or their families in exchange for, among other things, the student-athletes' commitment to play basketball for University-6 and University-7, thereby causing the universities to agree to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the bribe payments.

3.    It was a further part and object of the conspiracy that JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire

---

[1] In addition to the scheme to defraud described herein, the investigation has revealed another scheme whereby athlete advisors make direct bribe payments to coaches at universities in exchange for those coaches' agreement to influence and steer players under their control to retain the relevant athlete advisors.  That additional scheme is the subject of two related Complaints also unsealed today.  *See United States* v. *Chuck Connors Person, et al.*, 17 Mag. ___, and *United States* v. *Lamont Evans, et al.*, 17 Mag. ____.  All universities and players referenced in this Complaint and the two related Complaints have been numbered sequentially.  Accordingly, the players referenced in this Complaint begin with "Player-10," and the universities referenced in this Complaint begin with "University-6."

and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, GATTO, CODE, DAWKINS, AUGUSTINE, SOOD and others known and unknown, including basketball coaches employed by University-6 and University-7, participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, University-6 and University-7 by making and concealing bribe payments to high school student-athletes and/or their families in exchange for, among other things, the student-athletes' commitment to play basketball for University-6 and University-7, which deprived University-6 and University-7 of their right to control the use of their assets, including the decision of how to allocate a limited amount of athletic scholarships, and which, if revealed, would have further exposed the universities to tangible economic harm, including monetary and other penalties imposed by the National Collegiate Athletic Association (the "NCAA").

(Title 18, United States Code, Section 1349.)

### COUNT TWO
(Wire Fraud)

4.     From at least in or about May 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, to wit, GATTO, CODE, DAWKINS, AUGUSTINE, SOOD and others known and unknown, including basketball coaches employed at University-6 and University-7, participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, University-6 and University-7 by making and concealing bribe payments to high school student-athletes and/or their families in exchange for, among other things, the student-athletes'

3

commitment to play basketball for University-6 and University-7, thereby causing the universities to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the bribe payments.

(Title 18, United States Code, Sections 1343, 1349, and 2.)

## COUNT THREE
(Wire Fraud)

5.    From at least in or about May 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, to wit, GATTO, CODE, DAWKINS, AUGUSTINE, SOOD and others known and unknown, including basketball coaches employed by University-6 and University-7, participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, University-6 and University-7 by making and concealing bribe payments to high school student-athletes and/or their families in exchange for, among other things, the student-athletes' commitment to play basketball for University-6 and University-7, which deprived the universities of their right to control the use of their assets, including the decision of how to allocate a limited amount of athletic scholarships, and which, if revealed, would have further exposed the universities to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Sections 1343, 1349, and 2.)

## COUNT FOUR
(Money Laundering Conspiracy)

6.    From at least in or about May 2017, up to and including in or about September 2017, in the Southern District

4

of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

7.   It was a part and object of the conspiracy that JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud offenses alleged in Counts One, Two, and Three of this Complaint, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

(Title 18, United States Code, Section 1956(h).)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

8.   I am a Special Agent with the FBI, and I have been personally involved in the investigation of this matter, which has been handled by Special Agents of the FBI and Criminal Investigators in the United States Attorney's Office for the Southern District of New York (the "USAO"). I have been employed by the FBI since 2014. I and other members of the investigative team have experience in fraud and corruption investigations and techniques associated with such investigations, including executing search warrants, financial analysis, wiretaps, and working with informants.

9.   This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents, including

emails, and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## I.   OVERVIEW OF THE INVESTIGATION

10.   The charges in this Complaint result from a scheme involving bribery, corruption, and fraud in intercollegiate athletics. Since 2015, the FBI and USAO have been investigating the criminal influence of money on coaches and athletes who participate in intercollegiate basketball governed by the NCAA. As relevant here, the investigation has revealed multiple instances of bribes paid by athlete advisors, including financial advisors and business managers, as well as high-level apparel company employees, and facilitated by coaches employed by NCAA Division I universities, to student-athletes playing at or bound for NCAA Division I universities, and the families of such athletes, in exchange for a commitment by those athletes to matriculate at a specific university and a promise to ultimately sign agreements to be represented by the bribe-payors once the athletes enter the National Basketball Association ("NBA"). Moreover, the investigation has revealed that scheme participants take steps to conceal the illegal payments, including by (i) funneling them to athletes and/or their families indirectly through surrogates and non-profit institutions controlled by the scheme participants; and (ii) making or intending to make misrepresentations to the relevant universities regarding the involvement of student-athletes and coaches in the violation of NCAA rules.

11.   In particular, the investigation has revealed that JAMES GATTO, a/k/a "Jim," the defendant — a high-level executive of a global athletic apparel company ("Company-1") — and MERL CODE, the defendant – an individual affiliated with Company-1 and its high school and college basketball programs — conspired with coaches for universities sponsored by Company-1 to make payments to high school basketball players and/or their families in exchange for commitments by those players to attend and play for the Company-1-sponsored university, and to sign with Company-1 upon turning professional. In addition, CHRISTIAN DAWKINS, MUNISH SOOD, and JONATHAN BRAD AUGUSTINE, the defendants, brokered and facilitated the corrupt payments, in exchange for a promise that the players also would retain the services of DAWKINS, a business manager, and SOOD, a financial

advisor, upon turning professional. As set forth in more detail
below, in or around 2017, GATTO, CODE, DAWKINS, AUGUSTINE, and
SOOD agreed to pay bribes to at least three high school
basketball players and/or their families in the following
manner:

    a.    First, GATTO, CODE, DAWKINS and SOOD worked
together to funnel $100,000 from Company-1 to the family of a
high school basketball player ("Player-10") in exchange for
Player-10's commitment to play at an NCAA Division I university
whose athletic programs are sponsored by Company-1 ("University-
6"), and in further exchange for a commitment from Player-10 to
retain DAWKINS and SOOD, and to sign with Company-1, once
Player-10 joined a professional basketball league.

    b.    Second, DAWKINS and AUGUSTINE agreed to
facilitate payments to the family of another high school
basketball player ("Player-11") in exchange for Player-11's
commitment to play at University-6 and ultimately to retain
DAWKINS's services.

    c.    Third, GATTO, CODE, DAWKINS, and AUGUSTINE agreed
to make payments of as much as $150,000 from Company-1 to
another high school basketball player ("Player-12") in order to
secure Player-12's commitment to play at an NCAA Division I
university whose athletic programs are also sponsored by
Company-1 ("University-7"). In exchange for the $150,000
payment, Player-12 similarly was expected to commit to retaining
DAWKINS's services and signing with Company-1 once Player-12
joined a professional basketball league.

    12.    The scheme described herein served to defraud the
relevant universities in several ways. First, by virtue of
accepting and concealing payments that, if uncovered, would
render them ineligible to participate in Division I basketball,
the student-athletes and/or their family members conspired with
coaches and apparel company executives to obtain athletic-based
financial aid for the student-athletes from NCAA Division I
universities through false and fraudulent means. Indeed, for the
scheme to succeed and the athletic scholarships to be awarded
such that the athletes could play at a NCAA Division I
university, the student-athletes and coaches described herein
must falsely certify to the universities that they are unaware
of any rules violations, including the illegal payments. Second,

7

the scheme participants further defrauded the universities, or attempted to do so, by depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and coaches.  In doing so, the scheme  participants interfered with the universities' ability to control their assets and created a risk of tangible economic harm to the universities, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential ineligibility of the university's basketball team to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

## II.   THE NCAA AND RELEVANT NCAA RULES

13.  Based on my participation in this investigation, my review of publicly available information, and my conversations with other law enforcement agents who have reviewed such information, I have learned the following:

a.   The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, that regulates athletics for over 1,000 colleges and universities, conferences, and other associations.  NCAA member schools are organized into three separate divisions: Division I, Division II, and Division III.  University-6 and University-7 are in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA.

b.   Division I schools typically have the biggest student bodies, manage the largest athletics budgets and offer the most athletic scholarships.  Among other things, Division I schools must offer a minimum amount of financial assistance (in the form of scholarships) to their athletes; however, the NCAA sets a maximum number of scholarships available for each sport that a Division I school cannot exceed.  Currently, teams may offer no more than 13 athletic scholarships for the 2017-2018 men's basketball season.

14.  The official rulebook governing Division I schools is the NCAA Division I Manual (the "Manual"), which is published

annually and which contains the NCAA Constitution and its operating bylaws (the "Bylaws"). Based on my review of the Manual, I have learned the following, in relevant part:

a.    Among the NCAA's core principles for the conduct of intercollegiate athletics is a directive that "[s]tudent-athletes shall be amateurs in an intercollegiate sport;" and that "student-athletes should be protected from exploitation by professional and commercial enterprises." The Constitution further states that "an institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

b.    Consistent with the NCAA's core principles, any financial assistance to student-athletes other than from the university itself or the athletes' legal guardians is prohibited without express authorization from the NCAA. In addition, neither student-athletes, prospective student athletes, nor their relatives can accept benefits, including money, travel, clothing, or other merchandise, directly or indirectly from outside sources such as agents[2] or financial advisors. A student-athlete is rendered "ineligible" to participate in Division I sports if the athlete is recruited by a university or any "representative of its athletics interests" in violation of NCAA rules.

c.    Coaches and other team staff at NCAA Division I schools also are subject to various prohibitions, including (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes.

15.    Based on my review of the NCAA Constitution and its

---

[2] The NCAA Division I Bylaws define an "agent" broadly as "any individual who, directly or indirectly, . . . seeks to obtain any type of financial gain or benefit . . . from a student athlete's potential earnings as a professional athlete." Specifically included in the definition of "agent" is, among others, "a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed or associated with such persons."

Bylaws, I have learned that student-athletes, coaches, and staff members of athletics departments must complete annual certifications regarding their knowledge of NCAA rules violations, and, in the case of student-athletes, their continued eligibility to participate in NCAA-sponsored sports. In particular:

  a. On an annual basis, a student-athlete must "sign a statement . . . in which the student-athlete submits information related to eligibility, recruitment, financial aid, [and] amateur status," which is known as the "Student-Athlete Statement." In the Student-Athlete Statement, the student-athlete represents, among other things, that "[a]ll information provided to the NCAA . . . and the institution's admissions office is accurate and valid, including . . . [his] amateur status" and that the student-athlete has "reported to [his] director of athletics . . . any violations of NCAA regulations involving [him] and [his] institution." Furthermore, in signing the Student-Athlete Statement, the Student-Athlete certifies that "to the best of [his] knowledge, [he] has not violated any amateurism rules," and has "not provided false or misleading information concerning [his] amateur status to the NCAA . . . or the institution's athletics department."

  b. Coaches and staff members must certify annually that they have reported to their university any knowledge of violations of NCAA rules involving their institution.

  c. In addition, the Bylaws prohibit student-athletes, coaches and staff members of athletics departments from "knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation."

  16. As set forth in the Bylaws, violations of NCAA rules by a university or any individual may lead to penalties including, but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA; "limitations

on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

### III.   RELEVANT INDIVIDUALS AND ENTITIES

### A. The Athletic Apparel Company ("Company-1")

17.   Based on my participation in this investigation, including my review of publicly available information, I have learned that Company-1 is a multinational corporation that designs and manufactures shoes, clothing, and accessories for multiple sports, including basketball.  Company-1 sponsors numerous high school, college, and professional basketball programs, including a program for amateur pre-college athletes, and sponsors the athletic programs of a number of universities that regularly have top-ranked Division I men's basketball teams, including University-6 and University-7.

### B. JAMES GATTO, a/k/a "Jim"

18.   Based on my participation in this investigation, including my review of publicly available information, and my review of calls and conversations recorded as a part of this investigation, I have learned that JAMES GATTO, a/k/a "Jim," the defendant, is the head of Global Sports Marketing - Basketball for Company-1.  In that capacity, GATTO appears to oversee significant components of Company-1's high school and college basketball programs, including facilitating payments to players and their families as a part of the schemes described herein.

### C. MERL CODE

19.   Based on my participation in this investigation, including my review of publicly available information, and my review of calls and conversations recorded as a part of this investigation, I have learned that MERL CODE, the defendant, is affiliated with Company-1 and its high school and college basketball programs, and participated in organizing some of the payments made from Company-1 to players and their families as a part of the schemes described herein.  Prior to joining Company-

11

1, CODE worked as the Director of Elite Youth Basketball for a rival athletic apparel company.

### D. CHRISTIAN DAWKINS

20.    Based on my review of publicly available information, and my review of calls and conversations recorded as a part of this investigation, among other sources, I know that CHRISTIAN DAWKINS, the defendant, was an employee of a sports management company based in New Jersey ("SMC-1") between in or about 2015 until in or about May 2017.  Although DAWKINS is not a registered agent[3], the investigation has revealed that DAWKINS's job at SMC-1 primarily consisted of recruiting athletes as clients and maintaining client relationships for the firm.  In or about May 2017, SMC-1 terminated DAWKINS in connection with DAWKINS's alleged misuse of an athlete's credit card to pay for expenses from a ride services company without the athlete's authorization.  Since that time, as detailed below, DAWKINS has endeavored, with the assistance of other scheme participants, to start his own sports management business.

### E. JONATHAN BRAD AUGUSTINE

21.    Based on my review of publicly available information and my review of calls and conversations recorded as a part of this investigation, I know that JONATHAN BRAD AUGUSTINE, the defendant, is the Program Director for an amateur, high school-aged basketball team sponsored by Company-1 that participates in the "AAU," an amateur basketball league. AUGUSTINE is also the President of a Florida-based registered 501(c)(3) charitable organization whose stated purpose is to provide mentoring and assistance to high school athletes to help them "grow, develop and achieve in the classroom as well as to secure a scholarship to attend an accredited college or university."

---

[3] Based on my review of publicly available sources, I am aware that becoming a registered sports agent with the NBA requires approval by the NBA Players Association, the payment of annual fees, and successful completion of a written examination.  Only individuals who have met these requirements may recruit or represent NBA players.

### F. MUNISH SOOD

22.     Based on my participation in this investigation, including my review of publicly available information, I have learned that MUNISH SOOD, the defendant, is the founder of an investment services company ("the Investment Company") and serves as its Chief Investment Officer.  The Investment Company was founded in or about 2002 to provide investment management services to institutional and family office clients.  SOOD is a registered investment advisor.  Based on my conversations with a cooperating witness who has been providing information to law enforcement as a part of this investigation ("CW-1"),[4] I have learned that CW-1 met SOOD in or about 2011 or 2012, and that SOOD and CW-1 have known and worked with each other for several years.

### G. University-6

23.  Based on my review of publicly available information, I have learned that University-6 is a public research university located in Kentucky.  With approximately 22,640 students and over 7,000 faculty and staff members, it is one of the state's largest universities.  University-6 fields approximately 21 varsity sports teams in NCAA Division I competition, including men's basketball.

_____

[4] Based on my participation in the investigation, including my debriefings of CW-1, I am aware that CW-1 ran a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including athletes.  Information provided by CW-1 has been corroborated by, among other things, recorded conversations, electronic communications, and surveillance by law enforcement.  CW-1 began cooperating with the Government in or about November 2014.  All of CW-1's activities with respect to the defendants described in this Complaint were conducted at the direction of law enforcement.  In or about September 2017, CW-1 pleaded guilty to securities fraud, wire fraud, aggravated identity theft, and making false statements pursuant to a cooperation agreement with the Government.  On or about May 6, 2016, CW-1 agreed to settle civil charges filed by the Securities and Exchange Commission relating to CW-1's violations of certain securities laws.

13

24.  I know from publicly available information that, in each year relevant to this Complaint, University-6 received funds from the federal government in excess of $10,000 per year.

### H. University-7

25.  Based on my review of publicly available information, I have learned that University-7 is a private research university located in Florida.  With approximately 16,000 students and over 2,600 faculty members, it is one of the state's largest universities.  University-7 fields approximately 15 varsity sports teams in NCAA Division I competition, including men's basketball.

26.  I know from publicly available information that, in each year relevant to this Complaint, University-7 received funds from the federal government in excess of $10,000 per year.

### IV.   ALLEGATIONS INVOLVING UNIVERSITY-6

27.  As set forth in more detail herein, beginning in approximately May 2017, and continuing into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, and MUNISH SOOD, the defendants, and others known and unknown, conspired to illicitly funnel approximately $100,000 from Company-1 to the family of Player-10, an All-American high school basketball player; to assist one or more coaches at University-6 in securing Player-10's commitment to  play at University-6, a school sponsored by Company-1; and to further ensure that Player-10 ultimately retained the services of DAWKINS and SOOD and signed with Company-1 upon entering the NBA.  The bribe money was structured in a manner so as to conceal it from the NCAA and officials at University-6 by, among other things, having Company-1 wire money to third party consultants who then facilitated cash payments to Player-10's family.  Further, the scheme could only succeed, and Player-10 could only receive an athletic scholarship from University-6, if the scheme participants, including one or more coaches at University-6, made false certifications to University-6.

28.  I am also aware from my participation in this investigation that the agreement to make payments to the family of Player-10 was formulated in or around May 2017, after most of the top high school recruits from the Class of 2017 had already

committed to various universities and when, according to public reporting, Player-10, who was considered one of the top recruits nationally in his class, had indicated a desire to attend a number of rival schools, and not University-6. Based on publicly available information, I am aware that, on or about June 3, 2017, or almost immediately after the illicit bribe scheme set forth herein was agreed to, Player-10 publicly announced his intention to enroll at University-6. Contemporaneous press accounts described the announcement as a "surprise commitment" that "c[ame] out of nowhere" and a "late recruiting coup" for coaches at University-6.[5]

### A. The Defendants Agree to Pay Player-10's Family $100,000 to Matriculate at University-6, and Conceal the Payments Through an Entity Set Up by DAWKINS

29.   Based on my participation in this investigation, including my review of telephone calls over a cellular telephone used by CHRISTIAN DAWKINS, the defendant, that were intercepted pursuant to judicial authorization (the "Dawkins Wiretap"), and my discussions with other law enforcement officers, I have learned that in or around May of 2017, at the request of at least one coach from University-6, DAWKINS, JAMES GATTO, a/k/a "Jim," MERL CODE, MUNISH SOOD, the defendants, and others agreed to funnel $100,000 (payable in four installments) from Company-1 to the family of Player-10. Shortly after the agreement with the family of Player-10 was reached in late May and early June, Player-10 publicly committed to University-6.

30.   I have further learned that,[6] prior to paying Player-

_____

[5] Based on my review of publicly available information, I have learned that Player-10 is listed on the roster for the 2017-2018 University-6 men's basketball team.

[6] Except as otherwise indicated, the bases for my knowledge of the facts described in this Complaint are my participation in this investigation; my training and experience; my discussions with CW-1, and undercover law enforcement agents who participated in the investigation; and my review of the entirety of each recorded telephone call or meeting cited herein, and,

10's family, JAMES GATTO, a/k/a "Jim," and MERL CODE, the
defendants, first needed time to generate a sham purchase order
and invoice ostensibly to justify using Company-1 funds since
they could not lawfully pay the family of Player-10 directly and
risk that such prohibited payments be revealed.  Accordingly, in
or around July 2017, CHRISTIAN DAWKINS, the defendant, working
with CODE, arranged for MUNISH SOOD, the defendant, and an FBI
undercover agent ("UC-1") posing as a financial backer for
DAWKINS's and SOOD's new sports management business, to make an
initial $25,000 payment to Player-10's family on Company-1's
behalf, to be later reimbursed by Company-1.  In particular, on
or about July 7, 2017, DAWKINS and CODE had the following
discussion in a telephone call that was intercepted by the
Dawkins Wiretap:

    a.    CODE told DAWKINS that he had "bad news" about
the payments from Company-1 to Player-10's family, adding that
"my group gets [] an email about the invoice" that "ask[s] for
all these PO numbers and vendor numbers and blah blah blah blah
blah," referring to the document generated internally at
Company-1 meant to explain the $100,000 being allocated to pay
the family of Player-10.  CODE then explained to DAWKINS that he
had expected JAMES GATTO, a/k/a "Jim," the defendant, and
Company-1 to have handled the payment "off the books," noting
that CODE's "group" had received payments that year that "didn't
go through the system."

    b.    CODE then informed DAWKINS that he had tried to
submit an invoice to Company-1 for the $100,000 payment, routed
through CODE's consulting company, but that when he submitted
the invoice "for the whole [University-6] situation," Company-1

---

where available, a transcript of the call or meeting.  For every
instance in which I offer my interpretation of language used
during a recorded telephone call or meeting, that interpretation
is based on my training, experience, and participation in this
investigation, my review of the larger universe of recorded
telephone calls and meetings in addition to those contained
herein, and my discussions with CW-1 and the undercover law
enforcement agents.

"didn't have any record of [CODE's] organization in the system." CODE described how he would have to "create a vendor number" for his company and then a "purchase order" to justify the $100,000 payment, and, accordingly, they would not have access to the funds for several weeks. CODE lamented to DAWKINS that GATTO had not just "flex[ed] his muscle and push[ed] it through the system, but that's obviously not what's happening," and asked whether DAWKINS could arrange for SOOD or UC-1 to provide the initial payment to Player-10's father ("Father-2")[7] because Father-2 had been pressuring them for the money. CODE also said that SOOD or UC-1 ultimately would be reimbursed for the initial payment to Father-2.

　　　31. On or about July 10, 2017, MERL CODE and MUNISH SOOD, the defendants, spoke with UC-1 in a telephone call that was recorded by UC-1 at the direction of law enforcement.[8] During the call, CODE, SOOD and UC-1 discussed the need for UC-1 to fund the initial $25,000 payment to Father-2, and CODE explained how athletic apparel companies masked other, similar payments to high school athletes. In particular, during the July 10 call the following, among other things, was discussed:

　　　　　a. CODE, SOOD and UC-1 discussed the possibility that UC-1 would put up, or "front," the money needed to make the first $25,000 payment to Player-10's family because, according to CODE, "long story short, it's gotta go through some processes [at Company-1] and steps and what have you, and it takes a while, so we're talking another two to three weeks before it really runs through the corporate structure. And the dad's expectations were that Christian [DAWKINS] was going to be able

---

[7] A related Complaint, *United States* v. *Chuck Connors Person, et al.*, 17 Mag. ＿＿, references a "Father-1" who is a different individual.

[8] Based on my participation in this investigation and my review of a recording made by UC-1 of the meeting, I know that on June 20, 2017, CHRISTIAN DAWKINS, the defendant, introduced CODE to SOOD and UC-1 during a meeting in New York, New York, and that during this meeting, DAWKINS, CODE, SOOD and UC-1 discussed, in sum and substance and in part, their plan to make payments to college basketball players and coaches, including CODE's utility to the scheme as an insider of Company-1.

to help him do some things a month ago." CODE further explained that CHRISTIAN DAWKINS, the defendant, had called him and asked him to make sure that SOOD and UC-1 "were aware of the situation" and had asked them to provide the funds "with the understanding that they will be reimbursed" by Company-1.  CODE further suggested to SOOD and UC-1 that "for cleanliness and lack of questions," the money transfer to Father-2 should be in cash.  He then confirmed that the rationale for paying Father-2 was to ensure that Player-10 would sign with DAWKINS and Company-1 when he entered the NBA.  On the call, UC-1 agreed to lend DAWKINS and CODE the initial $25,000 payment for Player-10's family, and CODE confirmed that "reimbursement" to UC-1 by Company-1 could happen in "a number of ways."

        b.    CODE also told SOOD and UC-1 that "you guys are being introduced to . . . how stuff happens with kids and getting into particular schools and so this is kind of one of those instances where we needed to step up and help one of our flagship schools in [University-6], you know, secure a five star caliber kid.  Obviously that helps, you know, our potential business . . . and that's an [Company-1-sponsored] school." Highlighting CODE's desire to disguise the fact that Company-1 funds ultimately would be used for the $100,000 payment to Father-2, CODE further stated that by funneling the payments to student-athletes through third-party companies, Company-1 was "not engaging in a monetary relationship with an amateur athlete, we're engaging in a monetary relationship with a business manager, and whatever he decides to do with it, that's between him and the family."  CODE added that "we can't get involved directly in those kinds of situations and scenarios."

### B. DAWKINS, SOOD and UC-1 Pay Father-2 An Initial $25,000

        32.    On or about July 11, 2017, UC-1 traveled from New York, New York to the office of MUNISH SOOD, the defendant, in Princeton, New Jersey.  During the meeting, which UC-1 recorded, UC-1 provided SOOD with $25,000 in cash intended for Father-2, who, according to SOOD and CHRISTIAN DAWKINS, the defendant, would be flying to the New York City area to receive it.

        33.    On or about July 13, 2017, CHRISTIAN DAWKINS, the defendant, participated in a telephone call with a male who I believe, based on my participation in the investigation and the context of the call, was Father-2.  During the call, which was

intercepted over the Dawkins Wiretap, Father-2 stated that he
was renting a car to travel to meet MUNISH SOOD, the defendant.
DAWKINS told Father-2 that SOOD had $19,500 for Father-2, and
that DAWKINS would take care of "everything else."

34. On or about July 14, 2017, CHRISTIAN DAWKINS and
MUNISH SOOD, the defendants, participated in a telephone call
that was intercepted over the Dawkins Wiretap. During the call,
DAWKINS and SOOD discussed the meeting with Father-2, and SOOD
confirmed that he had given Father-2 the cash, adding that SOOD
believed they had secured Player-10's commitment to attend
[University-6] and ultimately to retain DAWKINS and the new
sports management company he was forming with SOOD, among
others. DAWKINS responded, "that kid could come over my house,
and have a key. Like that's what I do." DAWKINS further stated
that if Player-10 was "one and done," meaning that if Player-10
played one year of collegiate sports before entering the NBA
draft, "he may be top 20," but that if Player-10 played
collegiate basketball for two years, he "should be a top ten
pick."

## C. The Delay in Securing $100,000 From Company-1 to Pay
   Player-10's Family and GATTO's Concealment of the True
   Purpose of the Funds

35. On or about July 24, 2017, CHRISTIAN DAWKINS and MERL
CODE, the defendants, spoke on a telephone call that was
intercepted over the Dawkins Wiretap. During the call, DAWKINS
expressed concern with the delay by CODE and JAMES GATTO, a/k/a
"Jim," the defendant, in securing the $100,000 in funds from
Company-1 to pay Player-10 and his family, telling CODE that he
did not want anything "funky" to happen to the funding because
DAWKINS did not have $100,000 of his own money to pay Player-10.
CODE agreed, telling DAWKINS that he might have to "lean on" a
senior executive at Company-1 ("Senior Executive-1") "and some
of his side hustle off the book shit" in order to finance the
payments. CODE and DAWKINS then discussed how GATTO and others
at Company-1 were accounting for the unlawful transfer of funds
to Player-10's family by booking it on Company-1's records as a
payment to an outside organization affiliated with CODE. When
DAWKINS expressed surprise that GATTO was putting the payments
on Company-1's books at all, CODE confirmed that GATTO had
identified it "as a payment to my team, to my organization, so

it's on the books, [but] it's not on the books for what it's actually for."[9]

### D. The July 27 Meeting: DAWKINS, AUGUSTINE, UC-1, CW-1 and a University-6 Coach Discuss Payments from Company-1 to Another High School Basketball Player

36.   On or about July 27, 2017, CHRISTIAN DAWKINS and JONATHAN BRAD AUGUSTINE, the defendants, met in a hotel room in Las Vegas, Nevada, with CW-1, UC-1 and an assistant coach from University-6 ("Coach-1") (the "July 27 Meeting"). Prior to the meeting, the FBI placed video recorders inside of the hotel room; UC-1 also recorded the meeting. Based on my participation in the investigation, including my review of the recordings of the July 27 Meeting, as well as my debriefing of CW-1, I am aware that at the July 27 Meeting, the following was discussed, in sum and substance, and in part:

a.   DAWKINS explained to the group that "the player we're talking about tonight is [Player-11] with [University-6]," and noted that DAWKINS had dealt with coaches at University-6 on the recruitment of Player-10. DAWKINS then laid out the plan to funnel money to the family of Player-11, a high school basketball player who was expected to graduate in 2019, stating that "the mom is like . . . we need our fucking money. So we got to be able to fund the situation," adding "we're all working together to get this kid to [University-6]. Obviously, in turn,

---

[9] Based on my participation in this investigation, I am aware that GATTO and CODE started making plans in mid-September 2017 to submit another false and fraudulent invoice to Company-1 for the second $25,000 payment due to Father-2 in November 2017. In particular, on or about September 13, 2017, GATTO and CODE spoke on a telephone call that was intercepted pursuant to a judicially authorized wiretap on a cellphone used by CODE (the "Code Wiretap"). On the call, GATTO asked CODE, "When's the next uhh payment we gotta make for uhh [Player-10]?" and CODE responded that they had agreed to make four payments of $25,000 each, "so I would tell you probably November." GATTO then told CODE that they should "get the invoice in now," adding that "it's probably going to take a month, haha, in our system . . . Let's just get that out of the way now." GATTO noted that they would "figure out the other fifty in '18."

the kid will come back to us," referring to himself and the
business he was forming with the help of MUNISH SOOD, the
defendant, and UC-1.

        b.    Noting that University-6 was already on probation
with the NCAA, DAWKINS indicated that they would have to be
particularly careful with how they passed money to Player-11 and
his family.  Coach-1 agreed, stating "we gotta be very low key."
DAWKINS added, "The biggest thing is just making sure that every
month Brad [AUGUSTINE] gets what he needs" in order to funnel
the payments to Player-11 and his family.  AUGUSTINE noted that
Company-1, which sponsored his amateur team, would be supportive
of their recruitment efforts, and confirmed that "all my kids
will be [Company-1] kids."  DAWKINS concluded that their plan to
funnel money to Player-11 and/or his family in exchange for
Player-11's commitment to attend University-6 and to sign with
DAWKINS and Company-1 "works on every angle.  We have Merl [CODE,
the defendant] at [Company-1], we have Brad [AUGUSTINE] out with
the kid, and we have [University-6]," nodding at Coach-1.

        c.    DAWKINS, AUGUSTINE, and UC-1 then discussed the
logistics of how to get their share of the funding from DAWKINS
and UC-1 to AUGUSTINE each month without the payments being
detected.  AUGUSTINE suggested that the "easiest way" would be to
send the money to AUGUSTINE's "non-profit for the grassroots
team," although AUGUSTINE confirmed that he also would accept
cash.  UC-1 then handed AUGUSTINE an envelope containing $12,700
in cash, which DAWKINS explained "will take care of July, of
August."  UC-1 suggested to Coach-1 that the payment would
"mak[e] [University-6] and your program happy in the sense that
the kid is . . . going to [University-6], and after [University-
6], he's gonna come back to us."

        d.    At the meeting, AUGUSTINE stated that he expected
Company-1 to fund at least a portion of the future payments to
Player-11 and/or his family because, referring to a coach for
the University-6 men's basketball team ("Coach-2"), "no one
swings a bigger dick than [Coach-2]" at Company-1, adding that
"all [Coach-2 has to do] is pick up the phone and call somebody,
[and say] these are my guys, they're taking care of us."
DAWKINS, UC-1, and Coach-1 then discussed ensuring that Player-
11 ultimately signed with DAWKINS upon entering the NBA, and
Coach-1 explained that "[Coach-2] is not a guy to have his own
agent already set up" so that it would fall upon Coach-1 and

another assistant coach at University-6 to steer the athletes to certain advisors. With respect to Player-11, AUGUSTINE noted that "on my end, when I send my kids to college, before I send them, I'm having that conversation," and "with [Player-11], this is done."

        e.    Shortly thereafter, Coach-1 left the room, and DAWKINS, AUGUSTINE, UC-1 and CW-1 proceeded to discuss the Player-10 scheme described in paragraphs 27 to 35, *supra*, and, in particular, the involvement of Coach-2 in securing funding from Company-1 for Player-10's family. DAWKINS, who had been negotiating directly with Player-10's family, noted that Company-1 had originally agreed to pay a "certain number" to Player-10's family, but that a rival athletic apparel company was "coming with a higher number," such that DAWKINS needed to "get more" from Company-1 to secure Player-10's commitment to attend University-6. DAWKINS then said that he had spoken with Coach-2 about getting additional money for Player-10's family and informed Coach-2 that "I need you to call Jim Gatto, [the defendant,] who's the head of everything" at Company-1's basketball program.

    37.    Based on my review of call records, I am aware that on or about May 27, 2017, JAMES GATTO, a/k/a "Jim," the defendant, had two telephone conversations with a phone number used by Coach-2. Based on the same, I am aware that on or about June 1, 2017, GATTO had a third telephone conversation with the same phone number used by Coach-2. As noted above, two days later, on or about June 3, 2017, Player-10 officially committed to University-6 in return for the commitment by GATTO and Company-1 to pay $100,000 to his family.

## E. DAWKINS Explains to UC-2 the Different Schemes to Defraud Engaged in by the Defendants

    38.    In or around June 2017, UC-1, acting at the direction of law enforcement, introduced another FBI undercover agent ("UC-2") as a business associate of UC-1 who, along with UC-1, would be involved in providing the funding needed by CHRISTIAN DAWKINS, the defendant, to set up a new sports management company after DAWKINS was fired from SMC-1, as is described above. On or about August 8, 2017, UC-1 called DAWKINS and, during the call, which UC-1 recorded, UC-1 informed DAWKINS that UC-1 would be traveling internationally for the next month but

22

that both CW-1 and UC-2 would be available to meet with coaches and/or players in UC-1's absence, and to continue to fund payments per their prior discussions.

39.   Accordingly, on or about August 16, 2017, CHRISTIAN DAWKINS, the defendant, spoke with UC-2 on a telephone call that was recorded by UC-2 to explain to UC-2 the status of the various schemes, including the scheme to make the payments to Player-10 and Player-11 and their families described above, as well as additional payments DAWKINS and UC-2 would need to make in the upcoming weeks.  In particular, based on my review of a recording of the August 16 call and my discussions with UC-2, I have learned that DAWKINS and UC-2 discussed the following, in substance and in part:

a.   DAWKINS confirmed that he had facilitated the first $25,000 payment[10] to Player-10 and that MERL CODE, the defendant, had reimbursed DAWKINS on behalf of Company-1 through a payment to DAWKINS's "Loyd Inc. account."  DAWKINS also explained to UC-2 that they would need additional money for "two particular kids, one was [Player-10] who we're already involved with, we already got him done, so basically we just need to take care of his dad with two grand monthly" adding "I gotta just figure out how we get the two grand to him every month."  With respect to the second athlete, Player-11, DAWKINS told UC-2 that University-6 would need to get "five grand" to JONATHAN BRAD AUGUSTINE, the defendant, by August 25 so that AUGUSTINE could pass it on to Player-11's family.

b.   DAWKINS further explained to UC-2 that AUGUSTINE was an important asset to the scheme because he runs a "big time AAU grassroots program" and has "two kids that have a chance to both be 'one and done' kids. . . . one's name is [Player-12], [Player-12] is like the number seven ranked player in the country, and one is named [Player-11], who is also top ten in the country. [Player-11] is the kid who [University-6] is basically wanting to get financed right now, via Brad. So we're giving Brad five a month for [Player-11's] mom's bills and that

_____

[10] As is described above, at DAWKINS's suggestion, CODE asked UC-1 to provide the funds for the initial $25,000 payment to Father-2, informing UC-1 that UC-1 later would be reimbursed for these funds.

kind of stuff." As noted above, AUGUSTINE is the Program
Director for an amateur AAU basketball team; I have confirmed
from publicly available information that Player-11 played for
AUGUSTINE's AAU team.

c. DAWKINS also proposed to UC-2 that they fund
AUGUSTINE's non-profit organization, which had the potential to
generate multiple top-level basketball players for DAWKINS's
company, adding that "everything that can be put into his
nonprofit is a write off, obviously, a tax deduction" so "it's
not just like a normal payment to player" and could "be of
benefit to everybody across the board."

d. DAWKINS told UC-2 that he was in the "process of
signing people to agreements," including the family members of
the student-athletes to whom they were funneling money, because
"I want us as protected as possible across the board," adding
that "obviously, we have to put funding out, and obviously some
of it can't be completely accounted for on paper because some of
it is, whatever you want to call it, illegal."

## F. Financial Records Show That Company-1 Funds Were Used to Reimburse DAWKINS for the $25,000 Payment to Father-2

40. I have reviewed banking records for an account
belonging to "Loyd, Inc.," a company that I believe is owned by
CHRISTIAN DAWKINS, the defendant (the "Loyd Account"). From
those records I have learned that, on or about August 1, 2017,
DAWKINS deposited a $25,000 check into the Loyd Account. The
memo line on the check read "consulting fees."

41. Based on my review of financial records for the
account associated with the $25,000 check, I have learned that:

a. The $25,000 check was issued from a bank account
held in the name of an individual ("Individual-1") and an AAU
basketball program ("AAU Program-1"). Based on my review of
publicly available sources, I have determined that AAU Program-1
is sponsored by Company-1.

b. On or about August 1, 2017, the bank account held
in the name of Individual-1 and AAU Program-1 received an
incoming transfer of $30,000 from an account associated with a

24

Company-1 entity based in North America.

## G. The Defendants Continue to Pay AUGUSTINE and Father-2 As Part of the Scheme

42.   Based on my participation in this investigation, including my discussions with UC-2, I am aware that, on or about August 23, 2017, UC-2 met with MUNISH SOOD, the defendant, in Manhattan, New York, in order to provide SOOD with a cash payment of $20,000.  The meeting was recorded by UC-2.  Prior to the meeting, CHRISTIAN DAWKINS, the defendant, and UC-2 had discussed, on a call that was recorded by UC-2, among other things, that $5,000 of this money would be provided by SOOD to JONATHAN BRAD AUGUSTINE, the defendant, and that $2,000 of this money would be provided by SOOD to Father-2 as part of the agreement to pay Player-10 and/or his family in order to ensure that Player-10 would retain DAWKINS's new company in the future.[11]

### V.   ALLEGATIONS INVOLVING UNIVERSITY-7

43.   As set forth in more detail herein, beginning in approximately July 2017, and continuing into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, and JONATHAN BRAD AUGUSTINE, the defendants, and others known and unknown, conspired to illicitly funnel approximately $150,000 from Company-1 to Player-12, another top high school basketball player expected to graduate in 2018, to assist one or more coaches at University-7 in securing Player-12's commitment to play at University-7, and to further ensure that Player-12 ultimately signed with DAWKINS and with Company-1 upon entering a professional league.  Moreover, because Company-1 could not make the payments to Player-12 or his family directly, GATTO, CODE, DAWKINS, and AUGUSTINE planned to conceal the payments by funneling them through CODE, DAWKINS and AUGUSTINE, as well as

---

[11] As discussed on the call, DAWKINS relayed that the remainder of the $20,000 would be paid to other individuals not relevant to this Complaint.

an amateur basketball team controlled by AUGUSTINE.

## A. *CODE and DAWKINS Discuss the Involvement of University-7 Coaches in Funneling Payments to Player-12*

44.  On or about August 9, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, discussed — on a telephone call intercepted over the Dawkins Wiretap — paying Player-12 and/or his family at the request of at least one coach at University-7 ("Coach-3"). During the call, DAWKINS and CODE discussed the involvement of Coach-3 in ensuring that Company-1 would funnel payments to Player-12 in order to secure Player-12's commitment to play at University-7. In particular, on the call, DAWKINS told CODE that, according to JONATHAN BRAD AUGUSTINE, the defendant, "[Coach-3] knows everything," and that they could "start the process" to funnel the payments to Player-12 in order to ensure that Player-12 would commit to attend University-7 upon his graduation in 2018. With respect to the need to funnel money to Player-12, DAWKINS further informed CODE that Coach-3 "knows something gotta happen for it to get done," and CODE replied that he had just left a message for JAMES GATTO, a/k/a "Jim," the defendant, regarding the payment.

## B. *The Defendants Discuss a $150,000 Payment to Player-12 to Ensure That Player-12 Would Choose University-7 Over a Rival University*

45.  On or about August 11, 2017, JAMES GATTO, a/k/a "Jim," and MERL CODE, the defendants, spoke twice on telephone calls that were intercepted pursuant to the Code Wiretap. During those calls, GATTO and CODE discussed, among other things, Coach-3's request to GATTO that Company-1 make a $150,000 payment to Player-12 in order to prevent Player-12 from committing to attend another NCAA Division I university sponsored by a rival athletic apparel company that allegedly had offered Player-12 a substantial sum of money. In particular, I have learned that:

a.  On their initial call that day, CODE and GATTO discussed funneling payments from Company-1 to Player-12 in order to influence Player-12's decision to attend University-7, a school sponsored by Company-1. In particular, on the call, CODE informed GATTO that they had "another [University-6] situation" — referring to the scheme described above in

26

paragraphs 27 to 35 involving Player-10 and University-6 —
adding, "except it's with [University-7] this time." When GATTO
inquired whether University-7 was "hot," CODE explained that
"[University-7] wants this kid named [Player-12]." GATTO
confirmed that he knew already about University-7's request for
Player-12, and told CODE that he had  spoken to Coach-3,[12] who had
"just asked about the kid and then he said supposedly the kid
was having a meeting with" Senior Executive-1 at a Company-1
sponsored program geared toward high school amateur athletes
that occurred between on or about August 3 and August 7, 2017.

        b.    On a second call later the same day, CODE
discussed with GATTO, in sum and substance, and in part, the
involvement of CHRISTIAN DAWKINS and JONATHAN BRAD AUGUSTINE,
the defendants, in the scheme to facilitate payments to Player-
12 in order to secure Player-12's commitment to attend
University-7.  CODE explained that another Division I university
("University-4") was offering Player-12 $150,000 "and we're
trying to keep him from going to one of their schools."[13]  CODE
further told GATTO that DAWKINS and AUGUSTINE had asked CODE
whether GATTO "would be able to keep him at [University-7]
because they really want the kid." GATTO confirmed that Player-
12 would be a rising senior in high school, and CODE assured
GATTO that the payments need not be "all in one lump sum. I can,
I can make it work . . .," further noting that this situation
was "not one of those where I need an answer today. You know
what I am saying?  I just wanted to put it on your plate."

        c.    On the same call, GATTO inquired whether Company-
1 would "have to match the [University-4] deal?," and asked if
the payments could be pushed to 2018 noting "if I have to pay it
out in '18, that's fine" but adding "I just don't know if I, I
just don't know if I can do anything in '17 that's what I'm

---

[12] Based on my review of call records for a cellphone used by
GATTO, I am aware that, on or about August 6, 2017 (a few days
before the call between CODE and GATTO discussed in this
paragraph), GATTO had two telephone calls with a cellphone
number believed to be used by Coach-3.

[13] Based on publicly available information, I am aware that the
University-4 athletic program, including its men's basketball
team, is sponsored by a rival athletic apparel company.

saying." Referring to the scheme involving Player-10 detailed above, GATTO further told CODE that he should "try to get it to, what did we do with [Player-10], a 100," which I believe is a reference to the $100,000 payment to Player-10. CODE replied that he was not sure "they'll take that much less but if I can take it down at least twenty five," to which GATTO responded, "Alright, well let's just see."

46.    I have reviewed a telephone call on or about August 12, 2017 between MERL CODE and CHRISTIAN DAWKINS, the defendants, that was intercepted pursuant to both the Dawkins Wiretap and the Code Wiretap. On the call, CODE relayed the substance of CODE's discussion with JAMES GATTO, a/k/a "Jim," the defendant, regarding payments by Company-1 to Player-12, including GATTO's request that CODE negotiate the $150,000 asking price set by Player-12. According to CODE, however, if "[University-4]'s willing to" pay the full $150,000, "then that's where the kid is going to go." Referring to GATTO's statement that he did not have sufficient funds to pay Player-12 in 2017, CODE stated that if Company-1 waited until January 2018 to commit to a payment amount, "by that point that number might be 200," i.e., $200,000, adding that Company-1 "won't play if it's . . . at that level, we won't play." DAWKINS asked what would be the highest payment that GATTO and Company-1 would agree to, and CODE replied, "I think they do 150 if, if [Coach-3] stayed on it."

47.    On or about August 19, 2017, MERL CODE and JONATHAN BRAD AUGUSTINE, the defendants, spoke on a telephone call that was intercepted pursuant to the Code Wiretap. During the call, CODE informed AUGUSTINE that he would do what was necessary "to make sure that we secure[] the kid" but that "budget-wise, everything was kind of strapped for '17. . . So '18 puts us in a better place to have that conversation."

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, and that they be imprisoned or bailed, as the case may be.

JOHN VOURDERIS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25th day of September, 2017

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK